UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **JENNIFER KILLION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No.: 5:20-cv-0279-LCB |
| ) | |
| **ANDREW SAUL,** *Commissioner of* ) | |
| *Social Security Administration*, ) | |
| ) | |
| **Defendant.** | |

### MEMORANDUM OPINION

On March 2, 2020, the Plaintiff, Jennifer Killion, filed a complaint seeking judicial review of an adverse decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. § 405(g). The Commissioner filed an answer on June 29, 2020. Killion filed a brief in support of her position on September 11, 2020, and the Commissioner filed a response on October 13, 2020. Killion did not file a reply brief. Accordingly, the issue is now fully briefed and is ripe for review. For the reasons that follow, the Commissioner's final decision is affirmed.

### I.    Background

Killion protectively filed an application for a period of disability and disability insurance benefits on June 30, 2018, alleging disability beginning July 1, 2016. After the claim was denied on August 29, 2018, Killion requested a hearing

before an Administrative Law Judge ("ALJ"). That hearing was held on January 8, 2019. Killion was represented by counsel and testified at the hearing, as did a vocational expert ("VE"). The ALJ subsequently issued an unfavorable decision. Killion then requested review of the ALJ's decision by the Appeals Council, but that request was denied on February 5, 2020, and the Commissioner's decision became final. This lawsuit followed.

## II.   The ALJ's decision

After the hearing, the ALJ issued a written opinion explaining his decision. (Tr. pp. 18-25)[1]. In issuing his decision, the ALJ followed the five-step evaluation process set out by the Social Security Administration. 20 CFR 416.920(a). The steps are followed in order and, if it is determined that the claimant is or is not disabled at a particular step of the evaluation process, the ALJ will not proceed to the next step.

The first step requires the ALJ to determine whether the claimant is engaging in substantial gainful activity, which is defined as work involving significant physical or mental activities usually done for pay or profit. If a claimant is engaged in substantial gainful activity, she is not disabled, and the inquiry stops. Otherwise, the ALJ will proceed to step two. In the present case, the ALJ found that Killion did not engage in substantial gainful activity between July 1, 2016, the

---

[1] References to "Tr" denote the page numbers in the transcript prepared by the Commissioner appearing in the Court's CM/ECF system at (Doc. 7-2).

alleged onset date, and December 31, 2018, the date she was last insured. (Tr. p. 20). Accordingly, the ALJ moved on to the second step of the evaluation.

At step two, an ALJ is to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR 416.920(c). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities…." *Id.* If a claimant does not have a severe impairment, she is not disabled, and the inquiry ends. If she does have a severe impairment, the ALJ will proceed to the third step. In the present case, the ALJ found that Killion had the following severe impairments: dysautonomia, tachycardia, and irritable bowel syndrome. (Tr. p. 21).

At the third step, an ALJ determines whether the claimant's impairments or combination thereof are of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix I. If the claimant's impairment or impairments meet or equal a listed impairment, then the claimant is disabled, and the evaluation ends. Otherwise, the ALJ proceeds to the next step. In this case, the ALJ found that Killion's impairments did not meet or equal any of the listed criteria and, therefore, proceeded to step four. (Tr. p. 21).

Step four of the evaluation requires an ALJ to determine the claimant's residual functional capacity ("RFC"), and whether she has the RFC to perform the

requirements of any past relevant work.  20 CFR 416.920(f).  The term "past relevant work" means work performed within the last 15 years prior to the alleged date of onset.  If a claimant has the RFC to perform past relevant work, she is not disabled, and the evaluation stops.  Otherwise, the evaluation proceeds to the final step.  In Killion's case, the ALJ found that she had the RFC to perform her past work as a benefits manager and office manager.  (Tr. p. 21).  Therefore, he determined that Killion was not disabled as defined by the Social Security Administration and did not proceed to the final step of the evaluation process.

### III.  Standard of Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied.  *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id*. (internal citation and quotation marks omitted).  "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  Thus, while the Court must scrutinize the record as a whole, the Court must affirm if the decision is supported by substantial evidence, even if the evidence preponderates against the

Commissioner's findings. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264 (11th Cir. 2015); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

### IV. Killion's arguments

Killion raises three arguments in her brief. First, she argues that the ALJ's decision is not supported by substantial evidence because, she says, his findings regarding her RFC were incomplete and unsupported by the evidence. Second, she alleges that the ALJ considered her impairments separately and not in combination as the law requires. Finally, Killion contends that the ALJ improperly rejected her subjective testimony regarding the severity of her symptoms. The Court will address each argument in turn.

#### A. The ALJ's decision, including his RFC determination, is supported by substantial evidence.

The ALJ determined that Killion's RFC was as follows:

> the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps and stairs, but never ladders or scaffolds. The claimant can frequently balance, but occasionally stoop, kneel, crouch, and crawl. The claimant can occasionally tolerate exposure to extreme heat and cold. She can never tolerate exposure to hazards such as unprotected heights and moving mechanical parts.

(Tr. p. 21). Killion contends that this determination is incorrect because, she says, it failed to include limitations which were undisputed in the record. Specifically, Killion alleges that the ALJ did not consider her symptoms of dizziness and

5

presyncopal episodes resulting from her dysautonomia and tachycardia nor did he consider her constipation, diarrhea, abdominal pain, and nausea resulting from her irritable bowel syndrome.

Killion contends that "[t]he primary reasons for her being unable to work is her inability to concentrate during periods of dizziness and pre-syncope, as well as flare-ups of her irritable bowel syndrome causing abdominal pain and frequent bowel movements." (Doc. 12, p. 5). According to Killion, the ALJ's RFC determination does not mention these symptoms or how they might be expected to affect her ability to do the nonexertional requirements of her work, such as concentrating on and being persistent with tasks.

In response, the Commissioner asserts that the entirety of the ALJ's decision, including his RFC determination, is supported by substantial evidence. The Commissioner argues that "given the definition of light work in the regulations and SSR 83-10 and the substantial evidence discussed by the ALJ that supports his RFC finding, the ALJ was not required to further discuss [Killion's] ability to perform each of the exertional demands of light work." (Doc. 13, p. 9), citing *Castel v. Astrue*, 355 F. App'x 260, 263 (11th Cir. 2009).

In *Castel*, the Eleventh Circuit held: "We do not require the ALJ to "specifically refer to every piece of evidence in his decision, so long as the

decision is sufficient to allow us to conclude that the ALJ considered the claimant's medical condition as a whole."

A review of the ALJ's decision shows that he thoroughly considered all of Killion's medical conditions. In explaining how he arrived at his RFC determination, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. p. 21). The ALJ went on to discuss all of Killion's symptoms, including her dizziness and her presyncopal episodes. He also noted her testimony relating to her irritable bowel syndrome, e.g. severe vomiting, diarrhea, and abdominal cramps. (Tr. p. 22).

After noting all of Killion's symptoms, the ALJ found that, although her impairments could be expected to cause the alleged symptoms, Killion's testimony about the intensity, persistence, and limiting effects of the symptoms was not entirely consistent with the medical evidence and other evidence in the record. As to Killion's symptoms related to her irritable bowel syndrome, the ALJ noted that Killion was treated at Southeast Gastroenterology for diarrhea and abdominal cramping. However, her colonoscopy and colon biopsy were normal as were her stool and other laboratory studies. The ALJ noted that Killion began taking medication that she claimed greatly improved her symptoms. Records from her visit on April 12, 2018, reveal that, although Killion initially had little

improvement with her symptoms, the doctor changed her medication. After that change, Killion reported that she "feels great most days" and was having "a BM every few days" and "no diarrhea or abdominal pain." (Tr. p. 288). The ALJ also noted that Killion reported improved gastroenterological symptoms when she was seen at Cullman Internal Medicine. *See* (Tr. p. 241)(Killion denied "nausea, vomiting, reflux, abdominal pain, constipation, diarrhea, blood in stool, rectal bleeding, … [and] cramps" among other things.). This constitutes substantial evidence that the ALJ considered in making his RFC determination.

The ALJ also addressed Killion's symptoms from her dysautonomia and tachycardia but noted that her laboratory findings were unremarkable. The ALJ noted the conservative treatment plan, which included hydration, dietary instructions, exercise, lifestyle changes, and the use of compression stockings, indicated that her symptoms were not as severe as she claimed. *See* (Tr. p. 223). The ALJ also noted Killion's infrequent follow-up visits indicated that her symptoms were not as severe as she claimed.

The ALJ also discussed Killion's dysautonomia evaluation at the Cullman Cardiology Clinic where she stated that, although she had episodes of presyncope, i.e., she would almost pass out, she never had a full syncope episode. *See* (Tr. p. 308). The Court notes that this was inconsistent with Killion's testimony at the hearing. *See* (Tr. p. 40)(Killion stated that she has "passed out multiple times.").

Nevertheless, the ALJ noted that, at a follow-up visit to Cullman Cardiology, it was noted "that [Killion's] non-invasive testing was unremarkable, and her symptomology was not consistent with POTS syndrome, and only 'mildly' consistent with dysautonomia." (Tr. p. 23), citing (Tr. p. 311). It was noted at a subsequent visit at Cullman Cardiology that Killion was to "continue with a trial of conservative therapy" and that they had discussed "an exercise and strength training regimen." (Tr. p. 311).

Finally, the ALJ noted that, during her treatment at UAB Medicine, Killion's examination showed no cardiovascular abnormalities; she had normal peripheral perfusion and no edema; her lab studies were unremarkable; and that, although she complained of fatigue, palpitations, syncope, tachycardia, and lightheadedness, her physical examinations were normal. (Tr. p. 222). Moreover, during her treatment at Cullman Internal Medicine, she denied cardiovascular symptoms, chest pain, syncope, fatigue, and shortness of breath among other symptoms. She also underwent a GXT test that showed no "significant symptomology." (Tr. p. 313).

The Court also notes that Killion was referred to Dr. Paula Moore for her dysautonomia. Dr. Moore's records indicate that, while Killion complained of symptoms related to her dysautonomia, they were not severe. For example, Killion reported to Dr. Moore that she "has not had many, if any, spells" since being diagnosed with dysautonomia. (Tr. 230). Dr. Moore also noted that Killion's

medication had decreased her nausea and abdominal pain.  The ALJ's findings in this regard are supported by Killion's medical records.

The ALJ also reviewed and considered the opinion of Dr. Gloria Sellman, a State Agency Medical Consultant, who opined that Killion could perform various physical tasks including standing, walking, and frequently carrying ten pounds. The ALJ found that determination to be supported by the record, and this Court agrees.

Thus, contrary to Killion's assertion, the ALJ did incorporate the limitations that were supported by the record into his RFC determination.  Although the RFC does not specifically mention dizziness, presyncope, or her bowel symptoms, it is clear from the ALJ's decision that the ALJ took these into consideration when arriving at his findings.  For example, the ALJ determined that Killion "could never climb ladders or scaffolds … [and could] never tolerate exposure to hazards such as unprotected heights and moving mechanical parts." (Tr. p. 21).  This demonstrates that the ALJ considered Killion's dysautonomia symptoms in making his RFC determination.  As to Killion's irritable bowel syndrome, the ALJ thoroughly noted that Killion reported vast improvement with those symptoms. Accordingly, any functional limitations related to those symptoms were not supported by the record.  Ultimately, the ALJ's decision allows the Court to

conclude that the ALJ took all of Killion's symptoms into consideration when determining her RFC as required by *Castel*.

Killion also takes issue with the hypothetical posed by the ALJ to the vocational expert that ultimately became the RFC. "Plainly," Killion says, "there is no mention of any limitations associated with episodes of dizziness, pre-syncope or its symptoms in this hypothetical, or in the RFC." (Doc. 12, p. 7). As explained above, these symptoms were taken into consideration when the ALJ determined Killion's RFC. As to the content of the hypothetical question, the ALJ asked the VE to assume an individual who could "perform the full range of light work" with certain limitations. Although the ALJ did not specifically mention dizziness or presyncope in his question, the question did ask the VE to assume that the hypothetical individual could "occasionally climb ramps and stairs, but never climb ladders or scaffolds" and could never be "around hazards such as moving mechanical parts or unprotected heights." (Tr. 46-47). "A 'hypothetical question … adequately account[s] for a claimant's limitations ... when the question … otherwise implicitly account[s] for the … limitations.'" *Kinnard v. Comm'r of Soc. Sec.*, 426 F. App'x 835, 837 (11th Cir. 2011), quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir.2011). The hypothetical in question implicitly accounted for and adequately encompassed Killion's limitations from her dysautonomia.

As to any limitations resulting from Killion's irritable bowl syndrome, the ALJ found that these symptoms were not as severe as Killion alleged. As discussed above, this finding is supported by substantial evidence. Nevertheless, the ALJ's hypothetical asked the VE to assume a person who could perform "the full range of light work" with some limitations. The full range of light work also encompasses the full range of sedentary work. *See* 20 C.F.R. § 404.1567 ("If someone can do light work, we determine that he or she can also do sedentary work…."). The Court finds these ranges of ability sufficient to implicitly account for Killion's symptoms related to her irritable bowel syndrome. Accordingly, the ALJ's hypothetical questions posed to the VE were adequate, and his resulting RFC determination was supported by substantial evidence.

### B. The ALJ considered Killion's impairments in combination.

Killion argues that the ALJ erred by considering her impairments in isolation as opposed to considering them in combination with each other. Killion correctly asserts that "an ALJ must consider all medically determinable impairments in conjunction with one another in performing the latter steps of the sequential evaluation." (Doc. 12, p. 18) citing *Tuggerson-Brown v. Commissioner of Social Security*, 433 F. App'x 885, 951 (11th Cir. 2014). For example, Killion does not allege that she is disabled solely from her dysautonomia. Rather, it is that

condition in combination with her other severe conditions that renders her unable to work.

Killion appears to base this assertion on the fact that the ALJ addressed each of her impairments in separate paragraphs. However, a careful review of the entirety of the ALJ's decision reveals that he did in fact consider the impairments in combination with one another as required. The ALJ frequently used catch-all language when discussing his findings. For example, when making his RFC determination, the ALJ noted that he had "considered *all symptoms* and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence …." (Tr. p. 21). Further, at his step-three determination, the ALJ noted that Killion did not have "an impairment or combination of impairments" that met or equaled a listed impairment. These examples, along with the overall structure of the decision, convinces the Court that the ALJ properly considered Killion's impairments in combination with one another as required.

### C. The ALJ properly evaluated Killion's subjective testimony regarding her symptoms.

Finally, Killion asserts that the ALJ erred in finding that her subjective testimony regarding the severity and persistence of her symptoms was not supported by the medical evidence. As discussed in Section IV(A) above, the ALJ thoroughly laid out Killion's treatment history and explained how, on many

13

occasions, Killion told doctors that she felt fine or that her symptoms were improving. Additionally, the ALJ noted several instances where Killion's medical testing or laboratory studies were normal. As noted, the Court finds that to be substantial evidence to support the ALJ's decision.

In her brief, Killion argues as follows:

> "In the Eleventh Circuit, there is a well-established standard for assessing the credibility of subjective complaints. This standard requires (1) evidence of an underlying medical condition and *either* (2) objective medical evidence confirming the severity of the alleged symptoms arising from that condition, *or* (3) that the objectively determined medical condition is of such a severity that it can reasonably be expected to cause the alleged symptoms."

(Doc. 12, p. 9), citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Killion reads the ALJ's decision to say that her subjective complaints lack credibility because there was no objective medical evidence confirming their severity.

According to Killion, the ALJ's reasons for discrediting her subjective testimony are insufficient because, she says, some people experience symptoms differently. Killion asserts that her subjective complaints have been consistent throughout these proceedings and that the ALJ did not articulate explicit and adequate reasons for discrediting them. However, as noted above, the ALJ adequately laid out his reasoning for finding that Killion's symptoms were not as severe as she claimed. By citing to portions of the record in which Killion reported

improvement of her symptoms and other parts of the record in which providers noted that her test results were normal and prescribed conservative treatment, the ALJ adequately explained how he came to his conclusion. *See e.g.,* (Tr. p. 288)(Killion reported that she "feels great most days."); (Tr. p. 311)(Killion's symptomology was "mildly consistent with dysautonomia.").

Killion also she goes on to claim that the ALJ does not understand her conditions and was "playing doctor." For example, the ALJ found that Killion did not take prescription medication for her dysautonomia as evidence that her symptoms were not as severe as she claimed. According to Killion, this was error because there is no evidence that a person with dysautonomia has to be on medications in order for her symptoms to be severe. *See* (Doc. 12, p. 13)("There also is no evidence in this case that there is any prescribed medication for dysautonomia, although the ALJ clearly implies that there is."). However, this is not accurate. In Killion's records from Cullman Cardiology, the doctor stated that, if the prescribed exercise regimen was ineffective, then he would consider a medication called corlanar. (Tr., p. 311). The doctor noted that "although medicines like Florinef or ProAmatine might be helpful, I would like to try to avoid these in a patient who has baseline symptomology that is relatively mild." (Tr., p. 311-12). Thus, contrary to Killion's assertion, there is evidence in the record that patients with Killion's complaints are sometimes prescribed

15

medication. The fact that Killion's mild symptoms led this doctor to forgo prescribing medications supports the ALJ's finding regarding the severity of her symptoms. Accordingly, the ALJ did not err in determining that Killion's lack of prescribed medication indicated that her symptoms were mild.

The Court also notes the ALJ's determination about the severity of Killion's symptoms was not based on those conclusions alone. As noted above, the record contained substantial evidence on which the ALJ could have based his decision. Killion appears to be inviting this Court to disregard that evidence and focus on other evidence that Killion believes supports her disability. But that would be improper. This Court's function is to determine whether the ALJ based his decision on substantial evidence. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)("This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence."). Even if this Court would have come to a different conclusion than the ALJ, it must affirm the Commissioner's decision if it was based on substantial evidence. For the reasons stated above, the Court finds that the ALJ's decision was based on substantial evidence. Accordingly, Killion is due no relief on this claim.

### V. Conclusion

For the foregoing reasons, the Commissioner's final decision is **AFFIRMED**. A separate order will be entered.

**DONE** and **ORDERED** September 30, 2021.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE